Present: Carrico C.J., Compton, Lacy, Keenan, Koontz, and
Kinser, JJ., and Whiting, Senior Justice

ASPHALT ROADS & MATERIALS
COMPANY, INCORPORATED

OPINION BY
v.  Record No. 980805      SENIOR JUSTICE HENRY H. WHITING
                                    FEBRUARY 26, 1999

COMMONWEALTH OF VIRGINIA,
DEPARTMENT OF TRANSPORTATION, et al.

FROM THE COURT OF APPEALS OF VIRGINIA


The dispositive issue in this appeal is whether a

provision in a construction contract allows extra compensation

to a contractor for certain additional work on a highway

project.

In June 1992, Asphalt Roads and Materials Company,

Incorporated (Asphalt Roads) contracted with the Virginia

Department of Transportation (VDOT), an agency of the

Commonwealth, to widen a section of Landstown Road in Virginia

Beach.  The contract incorporated by reference VDOT's "January

1991 Road and Bridge Specifications" and any amendatory and

supplemental specifications.  Section references herein will

be to the "1991 Road and Bridge Specifications," as amended

and supplemented.

Asphalt Roads subcontracted with Kevcor Corporation

(Kevcor) to install the utility pipes in conformance with the

terms of Asphalt Roads' contract with VDOT.  The contract

required the contractor to remove and replace any soil that was unsuitable for use as backfill under the utility pipes.[1] The contract drawings indicated that there were 940 cubic yards of such soil. However, during excavation, Kevcor discovered that there were many more than 940 cubic yards of unsuitable soil and VDOT's inspector required that Kevcor remove and replace that extra unsuitable soil with "borrow," which is defined by § 101.02 as "[s]uitable material from sources outside the roadway."

Asphalt Roads, on behalf of Kevcor (collectively the contractor), claimed additional compensation for the excess unsuitable material that was discovered, removed, and replaced with borrow. Agreeing that the contractor was entitled to a part of its claim, VDOT paid for the removal of some of the material as an "unforeseen condition" covered by § 104.02.[2] VDOT also paid for some of the backfill under § 303.06(d) (quoted later herein). VDOT declined to pay the balance of

---

[1] Section 101.02 defines backfill as "[m]aterial used to replace or the act of replacing material removed during construction; may also denote material placed or the act of placing material adjacent to structures."

[2] Section 104.02(a) provides, in pertinent part: "Alterations of Quantities[.] [VDOT's] Engineer reserves the right to make, in writing, at any time during the work, such changes in quantities and such alterations in the work as are necessary to satisfactorily complete the project." (Emphasis added.)

the claim for a number of reasons, some of which are involved in this appeal.

After exhausting the administrative remedies provided by Code § 33.1-386, the contractor sued VDOT in the Circuit Court of the City of Virginia Beach under the provisions of Code § 33.1-387. At issue was the contractor's right of recovery and, if it had such a right, how much borrow had been required and how much unsuitable material had to be removed and disposed of.

The circuit court resolved these factual disputes by holding that the contractor was entitled to payment for an additional 8,657 cubic yards of backfill and 8,807 cubic yards of unsuitable material. The court adopted VDOT's contention that compensation for the backfill should be awarded at the contract-stated unit price of $6.18 for select borrow and awarded the contractor $53,500.26 on that claim.[3] With regard to the disposal of unsuitable material, the court adopted the contractor's contention that compensation should be in the amount of $11.16 per cubic yard, the unit price stated in the contract for the disposal of similar materials, and awarded the contractor $98,286.12 for that claim.

---

[3] Section 101.02 defines select borrow as "[b]orrow material that has specified physical characteristics."

On VDOT's appeal, the Court of Appeals reversed the portion of the judgment awarding the additional compensation, affirmed a part of the judgment, and remanded the case for further proceedings on issues not material here. We awarded the contractor an appeal limited to the hereinafter described issues.[4]

Here, the dispute is whether the Court of Appeals properly denied the contractor's described claim for extra compensation for excavating, removing, and replacing unsuitable material under and around the utility pipes. Among other things, the contractor contended that §§ 104.03 and 303.06 applied, not only to allow the claim, but also to fix the amount of the contractor's compensation.[5] The Court of

---

[4] Because this case originated before an administrative agency, the judgment of the Court of Appeals is ordinarily final and not subject to further appeal. Code § 17.1-410. However, we granted this appeal because we consider the primary issue involved to be a matter of significant precedential value. Id.

[5] We reject VDOT's contention that the contractor did not assert the differing site conditions clause either in the trial court or in the Court of Appeals. Our inspection of the record indicates that the contractor argued that § 104.03 was the applicable section on several occasions. First, the contractor introduced written correspondence with VDOT into evidence in which it asserted that § 104.03 was applicable. Second, at least one witness was specifically questioned by the contractor's counsel about § 104.03. Third, the contractor argued that § 104.03 was the applicable term on page 10 of its brief in the Court of Appeals. And indeed, the same attorney for VDOT who contends here that the differing site conditions clause was not asserted by the contractor in the courts below specifically responded to that contention

4

Appeals adopted VDOT's contention that §§ 302.04 and 520.06 were the controlling sections and that they did not provide for extra compensation.

For the reasons which follow, we do not think that §§ 302.04 and 520.06 control or conflict with the sections relied upon by the contractor to sustain its claim. As pertinent, §§ 302.04 and 520.06, both entitled "Measurement and Payment," provide generally that excavating, backfilling, disposing of unsuitable material, and restoring existing surfaces, are included in the contract unit price for pipe. However, neither deals specifically with the problems at hand, as do the sections relied upon by the contractor.

First, we decide whether the contractor is entitled to compensation for the backfill that had to be obtained from offsite sources to replace the unsuitable material. VDOT argues that §§ 302.04 and 520.06 preclude the payment of additional sums for obtaining borrow to replace the excess unsuitable soil removed by the contractor. For the following reason, we find no merit in this contention.

Section 303.06, also entitled "Measurement and Payment," provides, in subsection (d) that:

---

when asserted by the contractor not only in his oral argument for VDOT in the trial court, but also in VDOT's brief in the Court of Appeals.

5

Furnishing and placing backfill material, including backfill for undercut, will be included in the price for excavation. . . unless. . . suitable material is not available within the construction limits. When suitable backfill is not available within the construction limits, the material furnished and placed by the Contractor will be paid for in accordance with Section 109.05.

Section 303.06 is specific in providing that when suitable backfill is not available on the job site, the contractor will be compensated for the backfill provided from off-site sources. Hence, we hold that § 303.06 authorizes additional compensation to the contractor for having provided the additional backfill material. Accordingly, the trial court did not err in allowing additional compensation for that claim.

Next, we consider whether the contractor is entitled to additional compensation for removing and disposing of the excess unsuitable material. The contractor claims that it is entitled to such compensation under § 104.03, the differing site conditions clause. That section provides, in pertinent part, that

[d]uring the progress of the work, if subsurface or latent physical conditions are encountered at the site differing materially from those indicated in the contract,

then upon notification to VDOT and its determination that the conditions are materially different, "an adjustment, excluding

6

anticipated profit, will be made and the contract modified" to compensate the contractor for the contractor's increased cost.

The purpose of the differing site conditions clause and similar clauses, described in a number of cases as the "changed conditions clause," has been stated in several cases. The North Carolina Court of Appeals, for example, has stated that its purpose is "[t]o encourage low, competent bids," Ray D. Lowder, Inc., v. North Carolina State Highway Comm'n, 217 S.E.2d 682, 696, (N.C. Ct. App.) cert. denied, 218 S.E.2d 467 (N.C. 1975).

Similarly, the Court of Claims stated that the purpose of the clause was:

> [T]o take at least some of the gamble on subsurface conditions out of bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. They will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for risks which may not eventuate. It pays for difficult subsurface work only when it is encountered and was not indicated in the logs.

Foster Constr. C. A. & Williams Bros. Co. v. United States, 435 F.2d 873, 887 (Ct.Cl. 1970).

Although the differing site conditions clause included in the contract at issue must be included in most federal highway construction contracts pursuant to 23 C.F.R. § 635.109 (1997), apparently VDOT voluntarily inserted the clause to obtain its

7

benefits in securing the lowest competent bids. VDOT does not question the wisdom and utility of the differing site conditions clause, but instead contends that it does not apply to mere increases in government-estimated quantities of material as distinguished from the character and nature of materials. We disagree.

Since we apparently have not been confronted with this issue and the clause in question is similar to those in federal construction contracts, both parties cite, and we consider, cases arising under those contracts. Although VDOT cites cases allegedly supporting its contention that changes in quantity are not cognizable under the differing site conditions clause, we note that most of those cases deal with substantially different factual situations. We think that the better view is expressed by the following statement of the Court of Claims:

> The legal conclusion of the Appeals Board that a 39 percent overrun [in clearing all trees and brush along a 20 mile stretch of a river], in the facts and circumstances of this case, was a material change and warranted a price adjustment [under the change of conditions clause], is supported by numerous decisions in this court. To do otherwise, and hold the contractor to its original lump-sum bid, would negate one of the prime reasons for incorporating a "changed condition" article into these contracts, i.e., "to induce bidders not to increase their prices to cover possible misfortunes which might result from unforeseen developments." This is true even though the Army attempted to

8

protect itself by inserting caveatory and exculpatory provisions in the contract.

Schutt Construction Co., Inc. v. United States, 353 F.2d 1018, 1021 (Ct.Cl. 1965) (internal citations omitted).

We think that whether the changed conditions are "conditions . . . differing materially from those in the contract" under § 104.03 is a question of fact regardless of whether the claimed changes result in quantitative or qualitative changes to the work to be performed.

Even so, VDOT argues that the contractor has failed to make the necessary showing that it could not reasonably have ascertained from information available to it at the time of bidding that there would be an excess amount of unsuitable soil. Part of the evidence suggests that the contractor's employees should have anticipated the excessive amount of unsuitable material which would be encountered from their excavation experience of similar nearby areas. On the other hand, the contractor's employees testified that there was no practical way of ascertaining whether there was much more unsuitable soil to excavate than that contemplated by the contract.

Thus, the evidence conflicted on this issue, and that conflict has been resolved by the trial court's decision

implicitly rejecting VDOT's contention.[6]  Since credible

evidence supports that decision, we, as the reviewing court,

must reverse the judgment of the Court of Appeals and

reinstate the circuit court's judgment on that issue.  See

Rogers v. Marrow, 243 Va. 162, 166, 413 S.E.2d 344, 346 (1992)

(circuit court must reinstate jury verdict if credible

evidence to support it).

Next, VDOT argues that the Court of Appeals correctly

applied § 102.04 to deny the claim on the ground that this

section made the contractor responsible for any alleged excess

quantities of unsuitable soil.  As pertinent, § 102.04

provides:

> The submission of a bid will be considered
> conclusive evidence that the bidder has examined the

---

[6] Although the record does not indicate which section of
the specifications the trial court applied in awarding a
judgment on this claim, in the absence of clear evidence to
the contrary in the record, we presume that it correctly
applied the provisions of Code § 104.03 to the facts and that,
in doing so, it resolved any conflict in the facts in favor of
the contractor.  See Bottoms v. Bottoms, 249 Va. 410, 414, 457
S.E.2d 102, 105 (1995) (absent clear evidence to contrary in
record, appellate court assumes trial court correctly applied
law to facts and also views facts in light most favorable to
party prevailing in trial court).
    We do not think that the trial court could have made an
award under § 104.02 as set forth in the concurring opinion,
because these were not "changes" that were made by VDOT's
engineer, as expressly provided in that section and no such
"changes" were made in writing, as further provided in that
section. Indeed, VDOT, in making its payment of a part of
these claims, characterized them as arising from an
"unforeseen condition," one of the predicates for payment
under § 104.03.

> site of the proposed work, proposal, plans, standard drawings, specifications, . . . and any other documents specified in the proposal before submitting a bid and is satisfied as to the conditions to be encountered in performing the work and requirements specified in the proposal.
>
> . . . .
>
> The submission of a bid will be considered conclusive evidence that the bidder is satisfied with regard to the subsurface conditions to be encountered in the work.

Additionally, VDOT notes other warnings in § 102.04 which advise bidders that the available subsurface data are accurate with regard to test borings only and disclaim any warranty regarding subsurface conditions or the condition, amount, or nature of the material which may be encountered.

We reject these contentions. If we applied these sections to the change of condition shown in the evidence in this case, we would render meaningless the language of sections like § 104.03 and negate their salutary purposes. See Schutt Constr. Co., 353 F.2d at 1021. For these and other reasons, a number of cases have rejected similar contentions dealing with the relation of clauses like § 102.04 to clauses like § 104.03. See e.g., United Contractors v. United States, 368 F.2d 585 (Ct.Cl. 1966); Fehlhaber Corp. v. United States, 151 F. Supp. 817 (Ct.Cl.), cert. denied, 355 U.S. 877 (1957); Ray D. Lowder, Inc., 217 S.E.2d 682; Morrison-Knudsen Co. v. United States, 397 F.2d 826 (Ct.Cl. 1968).

Finally, and contrary to VDOT's contention, we conclude that since § 104.03 applies to a specific situation, "differing site conditions," it controls, rather than the general language in §§ 302.04 and 520.06.  We hold, therefore, that the contractor was entitled to additional compensation for the disposal of the excess material under § 104.03 of the contract.

For these reasons, we will reverse the judgment of the Court of Appeals, which reversed the circuit court's judgment awarding $151,786.38 to the contractor on the above claims. We will also enter final judgment in favor of the contractor on those claims, as provided in the judgment of the circuit court.[7]  We will remand the case to the Court of Appeals for its remand to the trial court for further action in conformance with the balance of the opinion of the Court of Appeals.

<u>Reversed,
final judgment in part,
and remanded.</u>

JUSTICE LACY, with whom JUSTICE KOONTZ and JUSTICE KINSER join, concurring.

---

[7] Because neither VDOT nor the contractor questioned the trial court's computation of the amounts due the contractor, the Court of Appeals did not, and we will not, review the trial court's method of determining the amount of extra compensation due to the contractor.

I concur with the majority's conclusion that contract § 303.06(d) entitled Kevcor to additional compensation for backfill because that section specifically authorizes payment for backfill brought onto the site from off site in accordance with the provisions of § 109.05. This specific section of the contract overrides the more general contract provisions relied upon by VDOT, §§ 302.04 and 520.06, which do not address additional compensation for backfill acquired off site. Because Asphalt Roads did not appeal the amount of additional compensation awarded by the trial court for backfill, I agree with the majority and would reinstate that part of the trial court's judgment awarding Kevcor $53,500 for the backfill.

Section 303.06, does not address additional compensation for disposal of unsuitable material. I disagree with the majority's conclusion that § 104.03, the Differing Site Conditions Clause of the contract, is the source of such compensation. The majority reached its conclusion through a two-step process. First, it announces that the issue whether the asserted changed conditions qualified as conditions "differing materially from those in the contract" under § 104.03 was one of fact. And second, the majority concludes that, in this case, the trial court resolved conflicting evidence and made the requisite finding of fact in Kevcor's favor, that is, that the site conditions differed materially

13

from those in the contract.  Assuming, arguendo, that the first step is correct, the record does not support a conclusion that the trial court made the factual finding asserted by the majority.

Although the trial court found that the evidence supported the additional compensation, there is nothing in the record that indicates that this conclusion was based upon an application of § 104.03 or upon any finding by the trial court of "materially different conditions."  The absence of such a finding is readily understood in light of the posture of the case when it reached the trial court.

At the time the project was bid, VDOT, Asphalt Roads, and Kevcor were aware that some of the material excavated would be unsuitable for use as backfill.  The contract estimated that there would be approximately 940 cubic yards of material unsuitable for backfill.  During the course of the excavation, however, VDOT's inspector informed Kevcor that none of the material being excavated would be suitable for backfill.  As a result of this change, Kevcor had to remove the unsuitable material and replace it with suitable backfill material obtained from sources outside of the project and also had to dispose of the unsuitable material outside of the project area.

14

VDOT, Kevcor, and Asphalt Roads engaged in many discussions regarding compensation for the backfill Kevcor brought to the site and the unsuitable material it disposed of off site.  At this time, Kevcor claimed additional compensation under §§ 303.06 and 109.05 of the contract.  VDOT agreed that Kevcor was entitled to additional compensation pursuant to § 104.02, entitled "Alteration of Quantities," which allows VDOT's engineer to change the quantities and make alterations in the work which are necessary to complete the project.[8]

---

[8] Section 104.02 of the contract provides:

The Engineer reserves the right to make, in writing, at any time during the work, such changes in quantities and such alterations in the work as are necessary to satisfactorily complete the project.  Such changes in quantities and alterations shall not invalidate the contract nor release the surety, and the Contractor agrees to perform the work as altered.

If the alterations or changes in quantities significantly change the character of the work under the contract, whether or not changed by any such different quantities or alterations, an adjustment, excluding anticipated profits, will be made to the contract.  The basis for the adjustment shall be agreed upon prior to the performance of the work.  If a basis cannot be agreed upon, then an adjustment will be made either for or against the Contractor in such amount as the Engineer may determine to be fair and equitable.

At the option of the Engineer, the Contractor may be directed to accomplish the work on a force account basis in accordance with the provisions of Section 109.05 of the Specifications.

However, a dispute arose between the parties over the amount of backfill needed and the amount of unsuitable material disposed off site for which additional compensation was due. In quantifying its claim, Kevcor asserted that it had delivered 18,742 cubic yards of backfill and disposed of the same amount of unsuitable material off site. VDOT insisted on measuring the compensable amount of backfill by using the PB-1 Pipe Bedding "X" dimensions as shown in the contract. Using that measurement, VDOT agreed to pay, and did pay, Kevcor for about half of the amount of backfill claimed by Kevcor, but refused to pay for the remainder. Kevcor

---

If the alterations or changes in quantities do not significantly change the character of the work to be performed under the contract, the altered work will be paid for as provided elsewhere in the contract.

The term "significant change" shall be construed to apply only to the following circumstances:

(1) When the character of the work as altered differs materially in kind or nature from that involved or included in the original proposed construction or

(2) when a major item of work, as defined elsewhere in the contract is increased or decreased more than 25 percent of the original contract quantity. Any allowance for an increase in quantity shall apply only to that portion in excess of 125 percent of original contract item quantity, or in case of a decrease below 75 percent, to the actual amount of work performed or

(3) When overruns and underruns of piling amount to more than 25 percent of the original bid quantity,

16

asserted that it was entitled to payment for the additional 9,323 cubic yards of backfill.

Kevcor, in its claim letter dated October 16, 1995, asserted that payment for the backfill was not limited by the measurement applied by VDOT, arguing that neither §§ 303.06(d), 109.05, nor any other provision in the contract limits the compensation for additional backfill to the amount measured by the PB-1 Pipe Bedding "X" dimensions. Kevcor also asserted that, under OSHA standards, it was required to protect workers by "means of sheeting, shoring, bracing or sloping the sides of the trenches" in which they worked. Kevcor explained that it was "physically impossible for a contractor to comply with the minimum "X" dimension for bedding and maintain that trench width to the top of the excavation and also provide the necessary protection for workers" as required by OSHA standards. Thus, Kevcor concluded that VDOT erroneously limited its additional compensation for both the backfill and the disposal of unsuitable material to the PB-1 Pipe Bedding "X" dimensions, and that Kevcor should be paid for an additional 9,323 cubic yards of backfill and for the off-site disposal of an additional 9,323 cubic yards of unsuitable material.

---

whether or not such item has been designated as a major item. 11-19-91 104(d)

Thus, Kevcor claimed it was entitled to an additional amount of $56,497.38 for the backfill and $103,112.38 for the off-site disposal of the unsuitable material based on $11.16 per cubic yard.[9]  VDOT refused to pay this claim.

Kevcor, through Asphalt Roads, appealed VDOT's denial of claim to the Commissioner of Transportation, pursuant to the administrative review procedure provided by Code § 33.1-386. The Commissioner also denied the claim, and Asphalt, on its own behalf and on behalf of Kevcor, filed its motion for judgment in the Circuit Court of the City of Virginia Beach.

Following an evidentiary hearing, the trial court stated from the bench that "the evidence established that Kevcor was entitled to additional compensation" for the backfill and disposal of unsuitable material, "although not as much, I would suspect, as [Asphalt] feels that it should have been entitled to on behalf of its subcontractor Kevcor."  The court went on to award $53,500.26 for the backfill and $98,286.12 for the disposal of unsuitable material, for a total of $151,786.38.  While the trial court stated that the amount "breaks down to" 8,657 cubic yards at $6.18 per cubic yard for the backfill and 8,807 cubic yards at $11.16 per cubic yard

---

[9] Although Kevcor also maintained it was entitled to approximately $10.00 a cubic yard for the backfill under § 109.05 of the contract, it agreed to accept the contract unit price for select borrow of $6.06 per cubic yard.

for the disposal of unsuitable material, the trial court did not indicate the source of these figures or the specific contract provision that authorized the additional compensation.

The dispute before the trial court was over VDOT's assertion that it only had to pay for the amounts as measured by the PB-1 Pipe Bedding "X" dimensions. In resolving this dispute, the trial court stated only that it believed the evidence established a right to additional compensation. This statement, given the posture of the case, indicates that the trial court determined only that VDOT and the Commissioner were wrong in limiting the amount of material for which Kevcor was entitled to compensation to the PB-1 Pipe Bedding "X" dimensions. Nothing in the record, in my opinion, indicates that the trial court found that the additional 9,000 cubic yards that had to be disposed of off site was a "materially different condition" under § 104.03 of the contract.

The specific contract provision that authorized this additional payment was not the crucial issue in the trial court.[10] VDOT had already paid Kevcor for approximately 9,000

---

[10] In its brief before the Court of Appeals, Asphalt Roads asserted that the only issue which could be decided by the trial court was the claim submitted to and denied by the Commissioner, specifically Asphalt Roads' attempt to obtain the difference between the actual cost of supplying suitable backfill from off site and disposing of unsuitable material

cubic yards of unsuitable material deposited off site under § 104.02.[11] It logically follows that the trial court assumed that the authorization for payment of the additional compensation it awarded was also § 104.02.

This record does not support the conclusion that the trial court made a factual finding that the site conditions were materially different than those in the contract. It does, however, support the trial court's decision that Kevcor was entitled to additional compensation for the amount of unsuitable material it disposed of off site, and that such compensation was not limited to amounts set out in the PB-1 Pipe Bedding "X" dimensions.

Accordingly, I would reverse the decision of the Court of Appeals and reinstate that portion of the trial court's judgment awarding Kevcor $98,286.12.

---

and the amount allowed and paid by VDOT. VDOT did not seek a set-off or counterclaim for amounts it had already paid. Virginia Code § 33.1-387 restricts the trial court to a review of the claims denied by the Commissioner.

[11] The record contains a number of documents authored by VDOT indicating VDOT's understanding that off-site disposal would be compensable under § 104.02. Similarly, there are a number of documents authored by Kevcor and Asphalt Roads that claimed compensation for the off-site disposal under § 104.02.